IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARION D. ROACHE,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )     Civ. No. 14-1002-LPS
                                     )
CAROLYN COLVIN,                      )
ACTING COMMISSIONER OF               )
SOCIAL SECURITY,                     )
                                     )
          Defendant.                 )

_____

Angela Pinto Ross, DOROSHOW, PASQUALE, KRAWITZ, SIEGEL & BHAYA, Wilmington,
DE.

     Attorney for Plaintiff.


Heather Benderson, Special Assistant United States Attorney, OFFICE OF THE GENERAL
COUNSEL, Philadelphia, PA,

     Attorney for Defendant.


**MEMORANDUM OPINION**


March 21, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.     INTRODUCTION[1]

Plaintiff Marion Roache ("Roache" or "Plaintiff") appeals from the decision of Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration ("the Commissioner" or "Defendant"), denying her claims for disability insurance benefits ("DIB" or "DIB's") and supplemental security income ("SSI") under Title II, 42 U.S.C. §§ 401-434 ("Title II"), and Title XVI, 42 U.S.C. §§ 1381-1383 ("Title XVI") of the Social Security Act.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).  Before the Court are cross-motions for summary judgment filed by Plaintiff and the Commissioner.  (D.I. 15, 23)

Plaintiff seeks DIB's from August 5, 2010 through March 8, 2013 or, in the alternative, asks for remand and further proceedings before the Commissioner.  (D.I. 16 at 36)  The Commissioner requests that the Court affirm the decisions denying Plaintiff's application for benefits.  (D.I. 24 at 27)  For the reasons set forth below, the Court grants in part Plaintiff's and Defendant's motions for summary judgment and remands for further proceedings before the Commissioner.

## II.     BACKGROUND

### A.     Procedural History

On August 5, 2010, Plaintiff filed a Title II and XVI application for SSI and DIB's.  (D.I. 8-5 at 2)  Plaintiff alleged disability beginning on June 13, 2010, due to three dislocated discs in her back.  (D.I. 8-5 at 2; 8-6 at 5)  After a hearing on May 6, 2013, an Administrative Law Judge

---

[1]Unless otherwise indicated, all facts are taken from the case record and supporting briefs submitted by the parties.

("ALJ") found that Plaintiff was not disabled within the meaning of the Social Security Act ("SSA") because her alleged conditions were not severe enough to prevent employment.  (D.I. 8-2 at 10-30)  Plaintiff filed a request for review, which was denied.  The Appeals Council also denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (D.I. 8-2 at 2-5)  Plaintiff then filed this civil action.

**B.      Relevant Medical Evidence**

Plaintiff was born on June 25, 1965.  (D.I. 8-3 at 25)  She was 44 years old on the onset date of her alleged disability, and 47 years old at the time of the ALJ's decision.  (D.I. 8-2 at 28; D.I. 8-5 at 2)  She completed the eleventh grade and previously worked as a certified nurse assistant.  (D.I. 8-6 at 5-6)  She stated at her hearing that she was unable to work because of (1) degenerative disc disease in her back; (2) tarsal tunnel syndrome in her left foot; and (3) depression.

**1.      Degenerative Disc Disease**

**a.      First car accident and surgery**

Plaintiff was injured in a car accident in October 2007.  (D.I. 8-7 at 31)  She was treated by three physicians: her primary care physician, Dr. Phyllis James; orthopedic surgeon Dr. Bruce Katz; and pain management specialist Dr. Phillip Kim.  (*Id*. at 3-31; 43-53; 58-67)  In April 2009, Plaintiff underwent a total disc replacement at L4-5.  (*Id*. at 7)

**b.      Follow-up treatment and onset of disability**

Following her disc replacement, Plaintiff continued to complain of pain in her lower back, right leg, right hip, and feet.  (*Id*. at 3-16; 56-58)  Drs. Katz and Kim treated Plaintiff with medication and trigger point injections throughout 2009.  (D.I. 8-7 at 9-16; 60; and 66-67)  A

January 2010 electromyography ("EMG") study was consistent with chronic right L5 radiculopathy. (*Id*. at 40)

Plaintiff contends that she became disabled in June 2010. In July and August 2010, Plaintiff complained to Dr. Katz of right back pain and left leg pain. (*Id*. at 15-16) Dr. Katz referred Plaintiff for a functional capacity evaluation ("FCE"), which was completed later that month. (*Id*. at 15; 32-34) Though she walked with a cane to maintain her balance, she was "not functionally limited by her mild right antalgic gait/associated right leg weakness and was capable of demonstrating functional activities without the single point cane." (*Id*. at 33) Based on this FCE, Dr. Katz found in August 2010 that Plaintiff was able to return to work for four hours per day at a medium Physical Demand Level ("PDL"). (D.I. 8-7 at 34)

Also in July 2010, Plaintiff saw Dr. Kim. At the visit, she rated the pain in her right leg as a "2" out of "10." (*Id*. at 57) Dr. Kim recommended an EMG study. (*Id*.) Plaintiff followed-up with Dr. Kim in August 2010 after obtaining the results of the EMG and nerve conduction studies, which showed that she suffered from a right L5, left S1 radiculopathy. (D.I. 8-7 at 42, 56) Dr. Kim found that these results were consistent with her complaints of pain in her back and buttocks, radiating down her leg. (*Id*. at 56) He recommended treatment with a Transcutaneous Nerve Stimulator ("TENS unit"). (*Id*.)

In November 2010, Plaintiff followed-up with Dr. Katz, complaining again of pain in her lower back and both legs. (D.I. 8-8 at 66) Dr. Katz noted that Plaintiff was able to walk heel to toe without difficulty; had a full and pain-free range of hip motion; had a normal lumbar range of motion; and had negative leg raising bilaterally. (*Id*.) Dr. Katz advised Plaintiff to continue using her pain medications and to follow-up if necessary. (*Id*.)

3

In February 2010, Plaintiff again complained to Dr. Kim of back and leg pain. (*Id*.)  Dr. Kim noted that Plaintiff had experienced some relief through the use of a TENS unit and continued to take pain medications as needed. (D.I. 8-8 at 16)  He also noted that she was being considered for a neurostimulator implant trial. (*Id*.)

### c.    Second car accident and surgery

On July 10, 2011, Plaintiff was involved in a second car accident. (*Id*. at 62)  At an appointment with Dr. Katz nine days later, she stated that her pain had increased from a "3" out of "10" before the accident to a "7" out of "10" afterwards, with a "new" type of pain that caused her right leg to fall asleep and made sitting difficult. (*Id*.)  She stated that, prior to the accident, she had not been using much pain medication, but after the accident had begun regularly taking Vicodin. (D.I. 8-8 at 62)  Her physical examination showed that she had a non-antalgic gait; a negative straight leg-raising test; a normal range of motion in her lumbar spine; and full strength in her hips, knees, and feet. (*Id*. at 63)  A lumbar x-ray showed "[n]o obvious fractures or instability." (*Id*.)  Dr. Katz diagnosed a lumbar strain/sprain, prescribed physical therapy, and instructed Plaintiff to follow-up in six weeks. (*Id*. at 64)  After 12 therapy sessions, Plaintiff stated that she felt minimal relief, and continued to experience back and leg pain that was more severe than what she had experienced prior to the accident. (D.I. 8-8 at 59-60)

In September 2011, Plaintiff underwent diagnostic tests: MRIs of her lumbar and thoracic spine and a CT scan of her lumbar spine.  Dr. Katz found that the MRI of her thoracic spine revealed a "small disc protrusion with no compression upon the spinal cord," while the MRI of her lumbar spine showed "significant artifact [of the disc replacement hardware] where the disc replacement was" as well as artifact in other areas. (*Id*. at 57)  The CT scan of her lumbar spine

revealed hardware that "appear[ed] to be in good position." (*Id.*) Dr. Katz recommended injections to "see if this helps improve her symptoms," and mentioned possible use of a nerve stimulator if no improvement was observed. (*Id.*)

Dr. Kim administered the injections in October 2011. (D.I. 8-10 at 15) In November 2011, Plaintiff reported to Dr. Katz that her pain was unimproved, and Dr. Katz ordered that she have a repeat CT scan in six months to rule out the possibility that her disc replacement was loosening. (D.I. 8-8 at 53) At a follow-up appointment in December, Plaintiff stated that her pain had actually worsened after the injection. (*Id.* at 10)

Dr. Kim scheduled Plaintiff for a neurostimulator trial, and on February 22, 2012 implanted two neurostimulator electrodes. (D.I. 8-8 at 68) Plaintiff reported no discomfort one week after the surgery. (D.I. 8-9 at 16-18) In April 2012, Plaintiff stated that the stimulator provided some relief, and later clarified that her pain was 45% better. (*Id.* at 6, 10) She further noted that Tylenol was sometimes effective for an intermittent, short-term burning sensation in her upper leg, and that she planned to taper her oral painkillers because they provided little relief and might not be refilled. (*Id.*) She reported no changes to her back and associated leg pain at follow-up appointments in April and October 2012. (*Id.* at 2, 10) At each appointment, Dr. Kim noted that she suffered antalgic gait, but had no loss of range of motion, joint pain, swelling, or weakness. (D.I. 8-9 at 2-13) In October, Plaintiff informed Dr. Kim that she continued to take pain medication to partially control ongoing "moderate to severe" pain in her back as well as her "right hip, buttock, and leg area." (*Id.* at 2-3)

### 2.    Tarsal Tunnel Syndrome

In August 2011, Plaintiff visited her primary care physician complaining of foot pain.

(D.I. 8-10 at 33) She was referred to and met with podiatrist Dr. Albert Iannucci in October 2011, describing tingling, burning, and aching feet. (D.I. 8-9 at 39) Dr. Iannucci recommended an EMG. (*Id*.) The EMG, conducted in 2011, was "suggestive of mild bilateral tarsal tunnel syndrome," as well as radiculopathy involving the spine. (D.I. 8-8 at 46-47)

At a follow-up appointment in November 2011, Dr. Iannuci administered a cortical steroid injection to determine whether Plaintiff's symptoms were mechanical or neurological. (D.I. 8-9 at 38) After Plaintiff's pain did not improve near the site of the injection, Dr. Iannucci sent her for physical therapy in December. (*Id*. at 37) When two weeks of physical therapy failed to yield improvements, Dr. Iannucci concluded that her symptoms were likely from a "peripheral/proximal source" rather than caused by mechanical defects. (*Id*. at 36) Because she was scheduled to obtain her neurostimulator implant the following month, Dr. Iannucci deferred further treatment to see whether the stimulator would be effective for her foot pain. (*Id*.)

The neurostimulator did not help, and Dr. Iannucci administered additional steroid injections in April and May 2012. (D.I. 8-9 at 33-35) Though the injections helped somewhat, Dr. Iannucci performed a surgical tarsal tunnel release and endoscopic plantar fasciatomy of Plaintiff's left foot and ankle on September 11, 2012. (D.I. 8-8 at 70-71) Plaintiff underwent physical therapy from late October to late December. (D.I. 8-11 at 2-39) She reported a significant decrease in pain, both at rest and during activity, over the course of her physical therapy. (*Id*. at 5) At a January 2013 appointment with Dr. Iannucci, Plaintiff stated that the symptoms in her left foot had improved since the surgery, though she still had ongoing symptoms of tarsal tunnel syndrome on the right side. (D.I. 8-9 at 23)

### 3.    Depression

In March 2010, Plaintiff saw nurse practitioner Catherine Doty for a psychiatric

evaluation.  (D.I. 8-7 at 71-76)  She complained of moodiness and decreased activity due to her

back pain.  (*Id*. at 71)  Doty found that Plaintiff's thinking was logical and coherent; that her

judgement was fair and insight good; that she was capable of adequate concentration and oriented

in the person/place/time dimensions; and that she was alert, spoke clearly, and made good eye

contact.  (*Id*. at 75)  Doty diagnosed Plaintiff with major depressive disorder and found that

Plaintiff was experiencing only moderate difficulty in day-to-day functioning.  (*Id*. at 76)

Plaintiff visited Doty approximately 15 times throughout 2010 and early 2011.  (D.I. 8-8 at 4-7)

Doty's notes indicate that Plaintiff's activity levels increased in 2011, and that she often came to

therapy in a reasonably positive, non-depressed mood.  (D.I. 8-7 at 69-76; D.I. 8-9 at 19-22)

From March through July of 2010, Plaintiff also attended six therapy sessions with Carol

Harrington, a mental health counselor.  (D.I. 8-7 at 80-85)  Plaintiff reported to Harrington that,

over that time, she became more active, attending a concert and helping to care for her mother.

(*Id*. at 84-85) Though Plaintiff continued to complain of anxiety and wanting to stay at home, she

stated that she was feeling better and Harrington concluded that her medication might be helping.

(*Id*. at 84)

### C.    Plaintiff's Testimony

#### 1.    Adult functioning self-reports

In September 2010, Plaintiff completed an Adult Function Report and Pain

Questionnaire.  In her Adult Function Report, she stated that she was able to work before her

injury but could no longer do so.  She stated that she experienced significantly restricted activity

that made it difficult for her to lift, squat, bend, stand, walk, sit, or kneel. (D.I. 8-6 at 17)

Although she remained able to care for herself, her children, and her household as a single

parent, she struggled with certain activities, like washing her hair or performing yard work, and

walked with a cane. (*Id*. at 12-18) She stated that she did not "get out much to do anything" –

partly because her physical limitations made it difficult for her to walk or engage in her usual

hobbies, and partly because she experienced anxiety about traffic and driving. (*Id*. at 15-19) In

her Pain Questionnaire, she stated that she experienced constant pain throughout the day, making

it impossible to attend church or work, or to engage in activities with her children, or participate

in her hobbies. (*Id*. at 20-21) She stated that use of Tylenol, a heating pad, a TENS unit, and

Epson salt soaks "help[ed] a little," and that prescription pain medications alleviated "some pain"

and "help[ed] short term." (D.I. 8-6 at 20-21)

      In April 2011, Plaintiff completed a second Adult Function Report, reporting essentially

the same condition as before. (*Id*. at 38-47) At that time, her friend Donna Tyler also submitted

a Third Party Adult Function Report. Tyler stated that Plaintiff was unable to work, engage in

activities with her children, or attend church. (*Id*. at 30-37) Tyler's report also indicates that

Plaintiff's ability to engage in certain activities, such as walking without a cane, laundry, and

socializing, depended whether she was having a "good day," and on her "discomfort level" or

"pain level." (*Id*.)

### 2.    Third-party letters

      In February 2012, both Tyler and Laticia John, another friend of Plainitff, submitted

third-party letters in support of Plaintiff's disability claim. Tyler stated that Plaintiff was

dependent on others and experienced depression due to her pain and inability to engage in

8

cooking and other activities. (D.I. 8-6 at 59) John stated that Plaintiff's life had changed

"tremendously" since her car accident. (*Id*. at 60) In particular, John noted that Plaintiff walked

with a cane 90% of the time, could not stand or sit for long, could not work, and could not be the

"very active sports mom" she had been before the accident. (*Id*.) John observed that Plaintiff

was depressed, had gained weight, and was in constant pain. (*Id*.)

### 3.    Administrative hearings

At her administrative hearing in February 2013, Plaintiff stated that she lived with her 11-

and 13-year-old children. (D.I. 8-2 at 45-46) She stated that her neurostimulator implant helped

with the burning sensation she had experienced in her back and leg, but that she still experienced

daily pain and spasms in her shoulders, back, legs, and feet. (*Id*. at 50-52)   Similarly, she stated

that she continued to experience swelling, pain, and burning in her left foot despite her tarsal

tunnel surgery. (*Id*. at 53-54) She rated her pain without medication a "10" on a 1-10 scale. (*Id*.

at 52) Although pain medications mitigated this pain to a "7," the pain nevertheless prevented

her from working. (D.I. 8-2 at 50-52) Plaintiff said that she continued to experience depression

and anxiety that had become worse over time, had trouble sleeping, and experienced unprovoked

mood swings and occasional panic attacks. (*Id*. at 55-60).

With regard to her functional abilities, Plaintiff testified that she could walk one block, sit

up for 25 minutes, lift 5 pounds, and stand for 15 to 20 minutes. (*Id*. at 61) She used a cane for

stability and was able to bend at the waist, but used a "reacher" to lift items from the floor. (*Id*.

at 61-62, 66) She continued to live in a house with her children and was able to take care of her

own personal care, cook with the oven and microwave, assist with housework, manage finances,

drive, and help her sons with grocery shopping. (D.I. 8-2 at 63-65) She also stated, however,

that she was basically "homebound," slept for much of the day because she could not sleep at night, and spent most of her time sitting on a heating pad.  (*Id.*)

### D.     Residual Functional Capacity ("RFC") Evaluations

#### 1.     Nurse Doty

In May 2011, Nurse Doty completed a mental impairment questionnaire, diagnosing Plaintiff with chronic depression and anxiety.  (D.I. 8-8 at 29-34)  The questionnaire states that Plaintiff had a Global Assessment of Functioning score of "55," indicating serious symptoms or serious impairment in social and occupational functioning.  (*Id.* at 29)  She stated that Plaintiff had limited but satisfactory ability to get along with coworkers, respond to changes in a work setting, and be aware of normal hazards that are necessary to perform unskilled work.  (*Id.* at 31)  However, Plaintiff was seriously limited with respect to other abilities necessary for unskilled work, including remembering work procedures, understanding instructions, carrying out instructions, working near others without distraction, making simple/routine decisions, asking simple questions or requesting assistance, accepting instructions, and responding appropriately to criticism from supervisors.  (*Id.*)  Doty stated that Plaintiff was unable to meet competitive standards with respect to the need to maintain attention for two hours, sustain ordinary routines without supervision, or deal with work stress. (D.I. 8-8 at 31)  Further, Doty assessed Plaintiff as unable to complete a normal workday without interruptions from psychological symptoms, work at a consistent pace without rest periods, or maintain regular attendance (estimating that Plaintiff's mental impairments or treatment would require her to be absent from work more than four days per month).  (*Id.* at 31, 34)

Similarly, Doty assessed Plaintiff as seriously limited or unable to meet competitive

standards with respect to all additional abilities and aptitudes necessary to do semiskilled or skilled work. (*Id.* at 32)  With regard to skills necessary to do particular types of jobs, Doty stated that Plaintiff had limited but satisfactory ability to maintain appropriate social behavior and adhere to basic standards of neatness and cleanliness. (*Id.*)  However, she had seriously limited ability to use public transportation, was unable to meet competitive standards with respect to interacting appropriately with the general public, and had no useful ability to travel in an unfamiliar place. (D.I. 8-8 at 32)

### 2. State Agency Consultants

State agency consultants evaluated Plaintiff's condition in 2010 and 2011.  A December 2010 report found that Plaintiff was limited to work that required little lifting, no more than three hours of walking, and no more than six hours of sitting per day. (D.I. 8-3 at 36, 41)  The report also advised that she should avoid exposure to vibration; should only occasionally climb stairs, stoop, kneel, crouch, or crawl; and should never climb ladders, ropes, or scaffolds. (*Id.* at 41)  Her ability to maintain concentration for extended periods of time was moderately limited. (*Id.* at 43)

After reviewing additional medical evidence, including Plaintiff's April 2011 Adult Function Report and her medical records from February and March 2011, the State affirmed its December 2010 findings about Plaintiff's physical condition. (D.I. 8-8 at 35)  After reviewing Plaintiff's mental health records, including Nurse Doty's May 2011 report, the State found that Plaintiff's allegations and symptoms were stable with medication, Nurse Doty's report took an overly pessimistic view of Plaintiff's ability to work, and Nurse Doty's report was inconsistent with Plaintiff's statements and medical record. (*Id.* at 36)

### 3.    Dr. Kim

In January 2013, Dr. Kim completed a medical source statement describing Plaintiff's condition. He stated that she had chronic pain and burning in her leg and back. (*Id.* at 49) He found that her condition led to reduced back flexion, abnormal gait, sensory loss, muscle spasm, and impaired sleep that prevented her from walking more than a block without rest or severe pain and limited her to jobs that permit shifting positions among standing, sitting and walking at will, such that she could walk for 10 minutes every 15 minutes. (*Id.* at 50-51) Further, he found that she could only sit for a total of less than two hours per day and stand or walk for less than two hours per day, and would need 15-minute unscheduled breaks four to six times per day. (D.I. 8-8 at 50-51) Finally, Dr. Kim stated that Plaintiff needed to use a cane; could rarely lift 10 pounds or less and never lift 20 or more; and could never twist, stoop, crouch, squat, or climb ladders or stairs. (*Id.*) He assessed her as "incapable of even 'low-stress' work." (*Id.* at 51-52)

### 4.    Dr. Iannucci

Also in January 2013, Dr. Iannucci completed a medical source statement describing Plaintiff's condition. He stated that she had chronic foot pain due to plantar fasciitis and tarsal tunnel syndrome, which prevented her from standing for more than 5-10 minutes, walking a block at a reasonable pace on a rough surface, walking enough to shop or bank, or climbing a few steps at a reasonable pace. (D.I. 8-9 at 45-46) While Dr. Iannucci assessed Plaintiff as able to sit for at least six hours per day, he added that she needed to elevate her legs level with her hip for at least half of the working day and take at least four unscheduled, 15-minute breaks each day. (*Id.*)

### E.    Vocational Expert Testimony

At Plaintiff's February 2013 administrative hearing, vocational expert ("VE") Ellen

Jenkins testified about Plaintiff's ability to find work given her physical limitations.  Jenkins

stated that Plaintiff's past experience as a CNA gave her no transferrable skills.  (D.I. 8-2 at 73)

She opined that an individual of Plaintiff's age and education level who was limited to sedentary

and unskilled work could perform work in the national economy as a security monitor, credit

card clerk, or order clerk.  (*Id*. at 73-74)  The VE added that although an individual with each of

the limitations listed in the Iannucci report would be capable of working, employers might fire

such an individual because of frequent absences.  (*Id*. at 78-82)  On the other hand, according to

the VE, an individual with all the limitations listed in the Kim report would be unable to find

work in the national economy.  (*Id*. at 77-78)

###### F.    The ALJ's Findings

Plaintiff appeals the ALJ's August 15, 2013 decision.  The ALJ "afforded great weight"

to the decision of another ALJ who had earlier evaluated Plaintiff's condition for the period of

June 17, 2008 to June 12, 2010.  (D.I. 8-2 at 25)  The ALJ summarized the earlier opinion as

finding that Plaintiff:

> could perform a significant range of sedentary work ([if] permitted
> to elevate her right leg occasionally during the course of a
> workday, cannot perform [tasks] requiring repetitive reaching
> and/or neck turning, and avoid push/pull tasks using her bilateral
> upper and right lower extremities.  In addition, cannot work in
> temperatures and/or humidity extremes, must be permitted to
> alternate between sitting and standing positions at will or
> approximately every 30 to 45 minutes and limited to simple,
> routine, unskilled work activities.

(*Id*.)  The ALJ noted that these findings deserved great weight because "the evidence of record

does not document significant changes in the claimant's medical condition since that decision."

(*Id*.)  The ALJ stated that, despite "concur[ring] with and generally adopt[ing] the prior . . .

finding as to the claimant's residual functional capacity," it was appropriate to "give the claimant the benefit of the doubt" by accounting for additional limitations incurred since the earlier decision. (*Id.*)

On August 15, 2013, the ALJ issued the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2014.

2. The claimant has not engaged in substantial gainful activity since June 13, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, tarsal tunnel syndrome, obesity, and depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), and 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is limited to only occasional climbing ramps/stairs, stooping, kneeling, crouching, crawling and only frequent balancing.  The claimant should never climb ladders/ropes/scaffolds.  The claimant should avoid concentrated exposure to vibrations.  She is limited to performing simple, repetitive work tasks, and to work that is not performed at a production pace.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 25, 1965 and was 44 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

14

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from June 13, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(D.I. 8 at 15-30)

## III.    LEGAL STANDARDS

### A.    Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to suppor

15

the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried its burden, the

nonmovant must then "come forward with specific facts showing that there is a genuine issue for

trial." *Matsushita,* 415 U.S. at 587 (internal quotation marks omitted).  The Court will "draw all

reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475

U.S. at 586–87; *see also Podohnik v. U.S. Postal Service,* 409 F.3d 584, 594 (3d Cir. 2005)

(stating that party opposing summary judgment "must present more than just bare assertions,

conclusory allegations or suspicions to show the existence of a genuine issue") (internal

quotation marks omitted).  However, the "mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 411 U.S. 242,

247-48 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex Corp. v.*

*Catrett,* 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial").

**B.      Review of the ALJ's Findings**

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.

17

1983).  Thus, the inquiry is not whether the Court would have made the same determination but,

rather, whether the Commissioner's conclusion was reasonable.  *See Brown v. Bowen*, 845 F.2d

1211, 1213 (3d Cir. 1983).  Even if the reviewing Court would have decided the case differently,

it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by

substantial evidence.  *See Monsour*, 239 F.3d at 1190-91.

## IV.    DISCUSSION

Plaintiff contends that the ALJ: (1) failed to evaluate all of the relevant evidence

supporting Plaintiff's claim for disability; (2) gave insufficient weight to the opinions of

Plaintiff's treating physicians, Drs. Kim and Iannucci, and nurse practitioner, Ms. Doty; and

(3) failed to sustain the burden of establishing that Plaintiff could find and perform other work in

the national economy.  (D.I. 16 at 5)  The Commissioner argues that the ALJ's determinations

were supported by substantial evidence and that the ALJ's decision should be affirmed.  (*See* D.I.

24 at 6-7)

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).  Title XVI of the

Social Security Act provides for the payment of disability benefits to indigent persons under the

SSI program.  *See* 42 U.S.C. § 1382(a).  A "disability" is defined for purposes of SSI as the

inability "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C.

§ 1382c(a)(3).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(l)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-23 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.  *See* 20 CFR § 416.920; *Russo v. Astrue*, 421 Fed. App'x. 184, 188 (3d Cir. Apr. 6, 2011).  If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further.  *See* 20 CFR § 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  *See* 20 CFR § 416.920(a)(4)(I) (mandating finding of non-disability when claimant is engaged in substantial gainful activity).  If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe.  *See* 20 CFR § 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe).  If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work.  *See* 20 CFR § 416.920(a)(4)(iii).  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.  *See* 20 CFR § 416.920(a)(4)(iii).  If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and

19

five. *See* 20 CFR § 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 CFR § 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999) (internal citation omitted).

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 CFR § 416.920(a)(4)(v) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See id.* at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [her] medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### B.   ALJ's Evaluation of the Evidence

Plaintiff contends that the ALJ failed to acknowledge and evaluate all of the medical evidence in this case, and as a result made several findings that contradict it. (D.I. 16 at 20) An

ALJ must consider all relevant evidence when determining an individual's residual functional capacity. *See* 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a), 404.1546; *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). An ALJ's finding of residual functional capacity must also include "a clear and satisfactory explication of the basis on which it rests." *Fargnoli*, 247 F.3d at 41(internal quotation marks omitted). These findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which ultimate factual conclusions are based," so that a reviewing court knows the basis of the ALJ's decision and can properly exercise its responsibility to determine whether substantial evidence supports it. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981) (internal quotation marks omitted).

The ALJ's opinion in this case extensively and comprehensively summarizes the Plaintiff's medical record. (D.I. 8-2 at at 20-28) The ALJ concluded that Plaintiff's statements about the degree of severity and constancy of her symptoms were inconsistent with this record. (*Id*. at 24) The ALJ based this conclusion on four subsidiary findings: (1) Plaintiff did not receive the type of treatment one would expect of a totally disabled individual; (2) Plaintiff's physical examinations did not reveal significantly decreased strength, sensation, or range of motion consistent with the severe symptoms she claimed to experience; (3) Plaintiff's work history showed that she had not engaged in substantial gainful activity for at least three years before the onset of her disability; and (4) Plaintiff's daily activities were not as limited as one might expect for a totally disabled individual. (*Id*. at 24-25) Plaintiff challenges the first and fourth of these conclusions as unsupported by substantial evidence.

21

### 1.    Treatment methods

The ALJ found that the treatment Plaintiff obtained over the course of her disability was not as extensive as one would expect for a totally disabled individual.  The ALJ noted that Plaintiff's treatment was "relatively limited and conservative overall." (*Id*. at 24)  Plaintiff contends that this and similar statements ignore "substantial portions of the medical evidence," in particular Plaintiff's foot surgery and neurostimulator implant.

The full context of the ALJ's statement clarifies its meaning.  After describing in detail the Plaintiff's medical record, including both surgeries (D.I. 8-2 at 20-24), the ALJ noted that Plaintiff:

> did not generally receive the type of medical treatment during the
> period at issue that one would expect for a totally disabled
> individual.  Treatment was relatively limited and conservative over
> all.  [Plaintiff] was treated primarily with medications, which
> appear to have been relatively effective in controlling her physical
> and mental symptoms.  [Plaintiff] uses a cane to ambulate but the
> cane was not prescribed by a doctor . . .

(*Id*. at 24)  Taken together, these statements show that the ALJ's characterization of Plaintiff's treatment as "limited and conservative" refers to the fact that her physicians treated her primarily with medication, and do not appear to have to have sought other solutions – such as devices to help her with locomotion – that one might expect physicians to consider when treating a totally disabled person.  Substantial evidence in the record supports the ALJ's findings.

In addition to the ALJ's characterization of Plaintiff's treatment as "limited and conservative," the ALJ noted that Plaintiff "uses a cane to ambulate but the cane was not prescribed by a doctor and the medical evidence of record does not indicate that it would preclude the residual functional capacity stated above." (*Id*.)  Substantial evidence in the record

supports these statements.  While Plaintiff's physicians never said that her cane was unnecessary, there is no evidence that her physicians prescribed it.  Moreover, even if her cane were medically necessary, the record does not indicate why her use of a cane is inconsistent with the ALJ's finding that Plaintiff has the "residual functional capacity to perform sedentary work . . . [including] only occasional climbing ramps/stairs, stooping, kneeling, crouching, crawling."  (*Id.* at 18)  Thus, both of the ALJ's statements about Plaintiff's cane are supported by substantial evidence in the record.

### 2.    Plaintiff's activity levels

After considering the entire record, the ALJ concluded that Plaintiff's activity levels were not as limited as one would expect of a totally disabled person.  The ALJ noted as examples that Plaintiff stated in 2011 that she could help her children go to school, do light household chores, and go to the grocery store once a month.  (D.I. 8-2 at 25)  Plaintiff does not dispute these statements.  Instead, she argues that by the time of her June 2013 testimony her condition was significantly more severe.  (D.I. 16 at 25)  While that may be, Plaintiff is seeking benefits for the period beginning in June 2010.  The record contains substantial evidence showing that Plaintiff was able to engage in the kinds of activities cited by the ALJ throughout 2010 and 2011.

### C.    Weight Afforded to Evaluations by Plaintiff's Medical Providers

Plaintiff argues that the ALJ erred in giving little weight to the medical source statements of Drs. Kim and Iannucci and no weight to the mental impairment questionnaire completed by nurse Catherine Doty.  (D.I. 16 at 25-30)  Treating physician opinions are assessed according to 20 C.F.R. §§ 404.1527, 416.927.  Controlling weight is afforded to a treating physician opinion when it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques

23

and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R.

§§ 404.1527(c)(2), 416.927(c); *see also Fargnoli*, 247 F.3d at 43. Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Adorno v. Shalala*, 40 F.3d 43, 46 (3d. Cir. 1994) (internal quotation marks omitted).

If a treating physician's opinion is not entitled to controlling weight, that determination

"must not automatically become a decision to give a treating physician's opinion no weight

whatsoever." *Gonzalez*, 537 F. Supp.2d at 660. Instead, an ALJ should consider numerous

factors in determining the weight to give it, including: the length of treatment relationship,

frequency of examination, nature and extent of the treatment relationship, supportability of the

opinion afforded by relevant medical evidence, consistency of the opinion with the record as a

whole, and specialization of the treating physician. *See* 20 CFR § 416.1527(c). In general,

physicians' reports deserve "great weight, especially when their opinions reflect expert judgment

based on a continuing observation of the patient's condition over a prolonged period of time."

*Plummer*, 186 F.3d at 429 (internal citation omitted). Thus, it is important to note that "in many

cases, a treating source's medical opinion will be entitled to the greatest weight and should be

adopted even if it does not meet the test for controlling weight." Social Security Rule 96-2P.

An ALJ may reject a treating physician's opinion "only on the basis of contradictory

medical evidence." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (internal quotation marks

omitted). It follows that an ALJ cannot reject a treating physician's opinion "for no reason or for

the wrong reason." *Id.* at 317 (internal quotation marks omitted). More specifically, an ALJ

"cannot disregard the opinion of a treating physician without referencing objective medical

evidence conflicting with the treating physician's opinion and explain[ing] the reasoning for

24

rejecting the opinions of the treating physician." *Dass v. Barnhart,* 386 F. Supp.2d 568, 576 (D. Del. 2005). When an ALJ's decision is to deny benefits, the notice of the determination generally must contain specific reasons for the weight given to the treating source's medical opinion, along with support from substantial evidence in the case record. *See* Social Security Rule 96-2P. The determination should make clear to any subsequent reviewers the weight the adjudicator gave the treating source's medical opinion and the reasons for that weight. *See id.*

It is not for this Court to re-weigh the medical opinions in the record but rather to determine if there is substantial evidence to support the ALJ's weighing of those opinions. *See Monsour,* 806 F.2d at 1190-91. Where detailed regulations prescribe the process an ALJ must follow in determining the weight to give particular evidence, the Court can and should remand for further proceedings if it appears the ALJ failed to follow these procedures. *See Jopson v. Astrue,* 517 F. Supp.2d 689, 702 (D. Del. 2007).

### 1.    **Dr. Kim**

The ALJ found that Dr. Kim was Plaintiff's treating physician, but afforded his opinion "little weight." (D.I. 8-2 at 27-28) The ALJ cited three reasons for doing so: Plaintiff saw Dr. Kim infrequently; his report suggested that he had "relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what [Plaintiff] reported;" and his report "contained inconsistencies." (*Id.* at 28) The ALJ did not, however, cite to contradictory medical evidence, nor explain how Dr. Kim appeared to the ALJ to have uncritically accepted Plaintiff's reports of her condition in a manner unsupported by "medically acceptable clinical . . . techniques." *Fargnoli*, 247 F.3d at 43. Further, the ALJ's description of Dr. Kim's report only recounted one inconsistency: the

25

contradictory statements that Plaintiff could both sit for 1 hour and 20 minutes at one time, and also needed to walk for 10 minutes every 15 minutes in an eight-hour work day.  (D.I. 8-2 at 27) These contradictory statements appear, however, to be the byproduct of an error in filling out the assessment form, which asked Dr. Kim to describe Plaintiff's capacity by checking boxes and circling numbers on scales.  Because this error is the only inconsistency the ALJ noted, and because the ALJ neither specified why Dr. Kim's assessment was not well-supported by clinical evidence nor cited medical evidence inconsistent with other substantial evidence in the record, the ALJ's decision to give little weight to the assessment is not supported by substantial evidence.  *See Fargnoli*, 247 F.3d at 41.

### 2. Dr. Iannucci

The ALJ found that Dr. Iannucci was Plaintiff's treating physician, but afforded his opinion "little weight."  (D.I. 8-2 at 27)  As with Dr. Kim, the ALJ cited three reasons for doing so: Plaintiff saw Dr. Iannucci infrequently; his report suggested that he had "relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff], and seemed to uncritically accept as true most, if not all, of what [Plaintiff] reported;" and his report "contained inconsistencies."  (*Id.*)  The ALJ did not, however, cite to contradictory medical evidence, nor cite inconsistencies in Dr. Iannucci's report, nor explain the inference that Dr. Iannucci had uncritically accepted Plaintiff's reports of her condition in a manner unsupported by "medically acceptable clinical . . . techniques."  *Fargnoli*, 247 F.3d at 43.  Because the ALJ neither specified why Dr. Iannucci's assessment was not well-supported by clinical evidence, nor cited medical evidence inconsistent with other substantial evidence in the record, the ALJ's decision to give it little weight is not supported by substantial evidence.  *See id.* at 41.

### 3.    Nurse Doty

The ALJ gave "no weight" to Nurse Doty's mental health evaluation of Plaintiff.  (D.I. 8-2 at 27)  The ALJ cited two reasons for doing so: (1) Ms. Doty is not an "acceptable medical source" for establishing a medically determinable impairment, and (2) Ms. Doty's opinion was unsupported by contemporaneous treatment notes, which were "brief, handwritten and mostly unreadable without apparent mental status examinations."  (*Id.* at 26-27)

Nurse practitioners like Ms. Doty are not "acceptable medical sources" that can "establish . . . a medically determinable impairment."  20 CFR § 404.1513(a).  However, evidence from nurse practitioners may be used to show "the severity of [an] impairment[] and how it affects [a claimant's] ability to work."  20 CFR § 404.1513(d).  In evaluating such evidence, factors to be considered include how long the practitioner has known the claimant and how frequently the practitioner has seen the claimant; how consistent the opinion is with other evidence; the degree to which the claimant presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty related to the individual's impairments; and any other factors that support or refute the opinion.  20 CFR § 404.1527(c).  Given these factors, and given that Ms. Doty's treatment records were illegible and did not sufficiently reflect an examination of Plaintiff's mental status, the ALJ's decision to give no weight to Ms. Doty's evaluation is supported by substantial evidence.

### D.    Establishing the Availability of Other Work in the National Economy

At the fifth step of the disability determination process, the Commissioner has the burden of showing that a claimant is capable of performing other available work given the claimant's residual functional capacity.  *Plummer*, 186 F.3d at 428.  As discussed earlier, the ALJ gave little

weight to the opinions of Plaintiff's treating physicians during the disability determination process, without substantial evidence to support that weighting.  Because the information in those opinions is relevant to determining Plaintiff's residual functional capacity, the ALJ's determination at step five also lacks substantial evidentiary support.  *See Jopson*, 517 F. Supp. 2d at 705 n. 18.

## V.    CONCLUSION

The Court will remand this matter to the Commissioner for further proceedings not inconsistent with this Memorandum Opinion.  The cross-motions for summary judgment will be granted in part and denied in part.  An appropriate order follows.